# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DELAWARE PUBLIC SCHOOLS LITIGATION | ) ) | C.A. No. 2018-0029-JTL COUNTY TRACK |

## MEMORANDUM OPINION

Date Submitted: April 18, 2022
Date Decided: April 26, 2022

Richard H. Morse, COMMUNITY LEGAL AID SOCIETY, INC., Wilmington, Delaware; Dwayne Bensing, ACLU FOUNDATION OF DELAWARE, INC., Wilmington, Delaware; Saul P. Morgenstern, Peta Gordon, ARNOLD & PORTER KAYE SCHOLER LLP, New York, New York; Counsel for Plaintiffs Delawareans for Educational Opportunity and the NAACP Delaware State Conference of Branches.

Mary A. Jacobson, Adam J. Singer, Nicholas J. Brannick, NEW CASTLE COUNTY LAW DEPARTMENT, New Castle, Delaware; Counsel for Defendant David M. Gregor, Chief Financial Officer for New Castle County.

Craig T. Eliassen, Gary E. Junge, SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware; Counsel for Defendant Susan Durham, Director of Finance for Kent County.

Krista M. Reale, MARGOLIS EDELSTEIN, Wilmington Delaware; Counsel for Defendant Gina Jennings, Director of Finance for Sussex County.

**LASTER, V.C.**

By order dated March 28, 2022, this court held that the plaintiffs could recover an award of fees and expenses[1] from New Castle County, Kent County, and Sussex County (collectively, the "Counties"). Dkt. 464 (the "Entitlement Order" or "EO"). The Entitlement Order did not quantify the award. The Counties have filed an application for the certification of an interlocutory appeal from the Entitlement Order. *See* Dkt. 468 (the "Application" or "Appl."). This order denies the Application, thereby recommending that the Delaware Supreme Court not accept the interlocutory appeal.

Supreme Court Rule 42 governs the certification of interlocutory appeals. Under its terms, any ruling that is certified for interlocutory appeal must have decided a substantial issue, defined as an issue going to the merits of the case. If the ruling decided a substantial issue, then Rule 42 instructs the trial court to consider eight factors in making a recommendation as to whether an interlocutory appeal would serve the interests of justice. In the words of Rule 42, there must be "substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal." Supr. Ct. R. 42(b)(ii).

---

[1] Rather than repeating "award of fees and expenses," this decision embraces colloquial terminology and refers to the "fee award." When quantified, the award will include reasonable expenses. The Delaware General Corporation Law takes the opposite approach. It uses the word "expenses" to encompass attorneys' fees. *See*, *e.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred"); *id.* § 145(b) (authorizing a corporation in a proceeding brought by or in the right of the corporation to provide indemnification "against expenses including attorneys' fees) actually and reasonably incurred"); *id.* § 145(c) (mandating corporation to indemnify a director or officer who was successful on the merits or otherwise in defending a proceeding "against expenses (including attorneys' fees) actually and reasonably incurred").

The Entitlement Order did not decide a substantial issue. The Entitlement Order addressed whether the plaintiffs could recover a fee award. That issue does not relate to the merits of the case. That fact alone is sufficient to deny certification.

Assuming for the sake of argument that the analysis proceeded further, none of the eight factors identified in Rule 42 supports certification. It is therefore unsurprising that the certification of an immediate appeal will not serve the interests of justice.

Importantly, there is an appropriate procedural route for the Counties to pursue a near-term appeal and have the Delaware Supreme Court consider their arguments before they have to pay any fee award. Once the fee award has been quantified, then all of its dimensions will have been established. There will be no further action for the trial court to take regarding the fee award, and it will be appropriate to enter the quantified award as a partial final judgment under Court of Chancery Rule 54(b). The Counties can appeal from that order as of right.

Proceeding under Rule 54(b) provides the appropriate path because, unlike Rule 42, Rule 54(b) does not require that a ruling have decided a substantial issue before a party can appeal. Rule 54(b) requires only that the issue have been resolved finally at the trial level and that there be no just reason for delaying an appeal. Once the fee award has been quantified, those criteria will be met. Proceeding in this fashion also comports with the ordinary course of litigation, in which an appeal reaches the Delaware Supreme Court after any fee award has been quantified. Following this course will enable the Delaware Supreme Court to hear a single appeal that addresses both the plaintiffs' entitlement to

receive a fee award and the amount of the award. Doing so avoids the risk of a second appeal regarding the amount of the award.

The Counties' primary argument for prosecuting an immediate appeal is that a reversal could obviate the need to expend resources determining the amount of an award. The potential savings should be small. The court regularly quantifies fee awards without extensive proceedings. The Counties have tried to depict the quantification of a fee award as an onerous task involving considerable discovery, but if the Counties choose to follow that road, that is a burden of their own creation.

The court therefore recommends that the Delaware Supreme Court decline to accept the interlocutory appeal. That recommendation takes the form of a denial of the Application.

## I.     FACTUAL BACKGROUND

The factual background is drawn from the submissions in connection with the Application and other filings on the docket. The Application represents but one part of a complex case, and this decision focuses on the facts relevant to the Application.

### A.     The Filing Of This Litigation

In January 2018, the NAACP Delaware State Conference of Branches (the "NAACP-DE") and Delawareans for Educational Opportunity (the "DEO") filed this litigation. Both are non-profit, non-partisan, civic-oriented institutions with a strong interest in Delaware's schools.

The NAACP-DE and the DEO pursued this litigation because they believe that Delaware's public schools are not providing an adequate education for students from low-

3

income households, students with disabilities, and students whose first language is not English (collectively, "Disadvantaged Students"). As one reason why Delaware's public schools fall short, the plaintiffs pointed to a broken system for funding Delaware's public schools.

One third of the funding for Delaware's public schools comes from local taxes. When school districts levy local taxes, they must use the assessment rolls prepared by the Counties. If there are problems with the Counties' assessment rolls, then those problems affect the school districts' ability to levy local taxes.

When preparing their annual assessment rolls, the Counties use valuations from three and four decades ago. Sussex County uses valuations from 1974. New Castle County uses valuations from 1983. Kent County uses valuations from 1987. Each county refers to its valuation year as its "base year." Two of the three Counties do not even use their full base-year valuations. Sussex County uses 50% of its base-year valuations. Kent County uses 60%. The Counties had no intention of updating their approach and every intention of using their methodologies indefinitely. This decision refers to the Counties' approach as the "Indefinite Base Year Methodology."

The plaintiffs contended that the Indefinite Base Year Methodology violated two clear provisions of Delaware law. First, under the Delaware Code, "[a]ll property subject to assessment shall be assessed at its true value in money." 9 *Del. C.* § 8306(a) (the "True Value Statute"). The Delaware Supreme Court has held that a property's true value in money is the same as its present fair market value. The plaintiffs contended that the Indefinite Base Year Methodology violated the True Value Statute because using

4

valuations from three and four decades ago—much less using 50% or 60% of those valuations—was not the same as assessing properties at their present fair market value.

Second, under the Delaware Constitution, "[a]ll taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax . . . ." Del. Const. art. VIII, § 1 (the "Uniformity Clause"). The Delaware Supreme Court has held that the Uniformity Clause requires that all taxpayers within the same general class to be treated the same. The plaintiffs contended that the Indefinite Base Year Methodology violated the Uniformity Clause because, during the decades since the Counties' valuations became effective, different properties have appreciated at different rates. By continuing to use the outdated valuations when preparing their assessment rolls, the Counties treated owners of similar properties differently. Owners of the same general class of property might pay taxes at the same nominal rate per dollar of assessed valuation, but the antiquated valuations means that owners of the same general class of property pay effective rates that are quite different. Owners whose properties have appreciated more pay a lower effective rate than owners whose properties have appreciated less.

The plaintiffs alleged that the Counties' decades-old assessment undermined the system for financing the public schools in several ways. First, the tax base for each school district generated less revenue than it otherwise would. The plaintiffs noted that in Fiscal Year 2016, the out-of-date assessments generated approximately $640 million in revenue for the public schools. *See* Compl. ¶ 27. At fair market value, the same rates would generate many times that figure. The plaintiffs acknowledged that switching to a legally compliant system of property assessment would not generate an increase in tax revenue of that

5

magnitude, because the Delaware Code caps the maximum increase in tax burden that any school district can accept after a reassessment at 10%. The pertinent provision states:

> Whenever the qualified voters of a reorganized school district have approved a specific rate of taxation or specified amount of taxation under § 1903 of this title and a subsequent general reassessment of all real estate in the county changes the total assessed valuation of the school district, the local board of education of each such local school district shall calculate a new real estate tax rate which, at its maximum, would realize no more than 10% increase in actual revenue over the revenue derived by real estate tax levied in the fiscal year immediately preceding such reassessed real estate valuation. Any subsequent increase in rate of taxation shall be achieved only by an election of the qualified voters in such local school district according to the procedures in § 1903 of this title.

14 *Del. C.* § 1916(b) (the "Ten Percent Provision").

Second, the plaintiffs observed that the Counties' persistent use of the Indefinite Base Year Methodology causes the Department of Education to allocate state-level funding for public schools inequitably among school districts. In an effort to support school districts that have less ability to generate local funding, the General Assembly has created a funding stream, known as "Equalization Funding," that is allocated using a formula. The formula is complex but relies in part on assessed values. With property values tied to values from decades ago, the formula no longer functions effectively.

Third, the plaintiffs explained that the Indefinite Base Year Methodology forces school districts to ask voters on a regular basis to raise their own taxes. Under the Counties' methodology, the value of a school district's tax base remains flat. The cost of running a school district, however, does not remain flat. Even if a school district just maintains the status quo, inflation erodes the purchasing power of the school district's budget. The Indefinite Base Year Methodology inevitably generates a funding gap.

6

To address the funding gap, school districts only have one option. The Delaware Code empowers each school board to set the amount of tax per dollar of assessed value that a property owner must pay. *See id.* § 1902. Using that authority, a school board can increase the tax rate so that the same assessed value generates more revenue. But the school board cannot levy the tax unilaterally. The school board first must "call a special election to be held at the polling place or places designated by the Department of Elections conducting the election." *Id.* § 1903. The outcome of the special election determines whether the tax can be levied. *See id.* § 1911.

Generally speaking, in Delaware, a school district needs to prevail in a referendum every three to five years. *See Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, App. A (Del. Ch. 2017) (list of school referendums in Delaware, since 1980, drawn from publicly available articles in The News Journal). Frequent tax referendums generate negative reactions. *See id.* (collecting articles discussing referendums, including failed referendums, and referencing community reactions). Some residents object as a matter of principle to having their taxes raised. Others infer from frequent tax increases that their tax dollars are not being used wisely. Community resentment does not help the public schools or Disadvantaged Students. And the need to pursue regular referendums distracts school personnel from their primary task of educating students.

The plaintiffs sought to address these problems by proving that the Counties failed to comply with the True Value Statute and the Uniformity Requirement. As their principal form of relief, they sought an injunction that would bar the Counties from collecting taxes until they complied with the True Value Statute and the Uniformity Requirement.

7

The plaintiffs envisioned that with a compliant system, school district revenues would rise with property values. The same tax rate would generate more money for the school district, so instead of having to seek voter approval to raise taxes to cover the same expenses, school districts could use referendums when they needed money for new initiatives. Freed of the burden of conducting regular referendums, school personnel could devote more time to education.

The plaintiffs likewise envisioned that with a compliant system, the Department of Education could use its formula for allocating Equalization Funding. Schools that could not raise as much revenue from local taxes would receive their fair share of Equalization Funding.

Finally, the plaintiffs envisioned that in the near term, to the extent that the Counties conducted a general reassessment, the school districts would be able to receive up to 10% more revenue. In New Castle County alone, the plaintiffs estimated that a general reassessment could add $64 million to the school districts' budgets.

## B.    The Motion To Dismiss

The Counties moved to dismiss the complaint. They advanced a series of reasons why the court ostensibly lacked subject matter jurisdiction over the dispute. They argued that the officials named in the dispute where not proper defendants. Kent County argued that the complaint failed to state a claim on which relief could be granted because it had no obligation ever to update its assessments.

During oral argument, New Castle County asserted for the first time that the plaintiffs lacked standing to pursue their claims. The parties had not briefed this issue, so the court declined to address it.

The court issued a decision that rejected the Counties' arguments. *Delawareans for Educ. Opportunity v. Carney*, 2018 WL 4849935 (Del. Ch. Oct. 5, 2018). The court severed the plaintiffs' claims against the Counties from other claims that the plaintiffs had advanced against state-level defendants. *See* Dkt. 67. The court further bifurcated the claims against the Counties into a liability phase and a remedial phase. *See* Dkt. 98.

The parties proceeded to conduct fact discovery and expert discovery. During this phase, the case moved relatively rapidly. Measured from when the Counties filed their answers, discovery and trial preparation took only six months.

On the eve of trial, the Counties moved for summary judgment on their theory that the plaintiffs lacked standing. Dkt. 157. The court denied the motion without prejudice, accepted evidence on the question of standing during trial, and permitted the parties to address the issue of standing during post-trial briefing and argument. Dkt. 206.

## C. The Trial

The court held a two-day trial to address the plaintiffs' claims. It was undisputed that each of the Counties used the Indefinite Base Year Methodology. It was undisputed that none of the Counties had any intention of changing their methodologies.

It was effectively undisputed that the Counties' assessments were non-uniform. The plaintiffs had served requests for admissions on that point, which the Counties denied. Nevertheless, during discovery, County officials implicitly recognized the lack of

9

uniformity by testifying about the need for a general reassessment. A Kent County official admitted that the county should conduct a general reassessment "for equity purposes." PTO ¶ 84 (internal quotation marks omitted). A New Castle County official admitted that the county should conduct a general reassessment "so that the application of real estate taxes across the county would be equitable." *Id.* ¶ 61 (internal quotation marks omitted). He further agreed that the divergent levels of assessment have become "an issue of credibility that we are applying things in such a way that you can have predictable results." Gregor Dep. 77.

The plaintiffs presented an expert who analyzed the Counties' assessments. The Counties did not present any expert testimony. Instead, the Counties objected that the analysis conducted by the plaintiffs' expert was so unreliable as to be inadmissible under Delaware Rule of Evidence 702. Those objections consisted of lawyers' argument, and the court rejected them. *In re Del. Pub. Sch. Litig. (DEO III)*, 239 A.3d 451, 501 (Del. Ch. 2020).

The Counties had only one other significant response to the plaintiffs' expert and his analysis. During expert discovery, the Counties identified a typographical error in the formula that the plaintiffs' expert used for one of his analyses. The Counties chose not to depose the plaintiffs' expert and question him about the error before trial. The Counties had no expert of their own, so no competing expert identified the error. The Counties raised the issue for the first time on cross examination during trial, when it was too late to correct it. The error was not a methodological problem, nor was there any defect in the data. It was simply a typo.

10

As their principal defense to the case, the Counties argued that the plaintiffs lacked standing to sue. In contrast to their position on the merits, where the Counties introduced neither factual evidence nor expert testimony and advanced only a handful of arguments, the Counties advanced their standing argument with vigor.

After receiving post-trial briefing and hearing post-trial argument, the court issued its post-trial decision. The court found that when preparing their assessment rolls, the Counties failed to comply with the True Value Requirement and the Uniformity Requirement. In reaching this conclusion, the court rejected the Counties' evidentiary objections to the analysis presented by the plaintiffs' expert. *DEO III*, 239 A.3d at 451.

The court also determined that the plaintiffs had standing to sue. When making determinations regarding standing, the court made factual findings establishing that the Counties' practice of using stale assessments directly affects school district funding and reduces the level of services that schools can provide. *See id.* at 470–75. The court also relied on evidence demonstrating that Delaware policy makers have repeatedly reached the same conclusions. *See* JX 3; JX 4; JX 9; JX 13; JX 21.

The court's analysis of standing also addressed an argument that the Counties have recycled in multiple guises throughout the case. The Counties have relied repeatedly on the fact that under the Ten Percent Provision, each school board gets to decide whether to set a new tax rate that will enable the school district to receive up to 10% more revenue. For purposes of the motion to dismiss, the counties argued that any relief that this court granted would be an advisory opinion and not have any real world effect because the school boards could reject the increase. In the standing-related version, the Counties argued that because

a school board theoretically could reject the 10% increase, the plaintiffs' injury could not be redressed by a favorable decision and they therefore lacked standing to sue. Now, in the fee-related iteration, the Counties are arguing that any benefit from the litigation is speculative because the school boards might not accept the money.

In its post-trial decision, the court rejected the lynchpin of this theory:

> The logjam over the local component of school funding has a key log, and it is the counties' failure assess property in compliance with the True Value Statute and the Uniformity Clause. This litigation can redress that injury directly. Moreover, the outcome of the declaratory judgments that the plaintiffs seek is not a one-time thing. If the Delaware courts determine that the counties' indefinite-base-year method fails to comply with the True Value Statute and the Uniformity Clause, then the counties will be obligated to comply with those requirements on an annual basis. As described in the Factual Background, the evidence demonstrates that ongoing compliance will result in property assessments that rise over time, at a minimum due to inflation and potentially also due to property appreciation. As those assessments improve, schools will receive more local funding, without any need for a re-determination of the applicable tax rate under Section 1916(b).
>
> Regardless, it is highly likely that school districts will happily accept the 10% increase in revenue that would result from a general reassessment. Given that school districts currently call for referendums every three to five years in an effort to mitigate the effects of the counties' failures to comply with their legal obligations, it is unlikely that school districts would reject the increase.

*DEO III*, 239 A.3d at 532. Although the Counties now say that the record contained no evidence about how school districts would act, there was ample circumstantial evidence to support the inference that the court drew and the resulting factual finding it made. That evidence included the historic regularity by which school districts seek more funding by the hard road of referendum, demonstrating an on-going need, and the repeated observations of Delaware policy makers to the effect that the schools were being harmed by the current system and needed more funding. A court also can (and necessarily will)

12

rely on certain empirical assumptions about the world,[2] such as the reality of inflation and the recognition that organizations generally seek more funds to address their needs.

The court's post-trial decision did not reach the issue of remedy. The decision noted that the court had separated the issue of remedy and explained that further proceedings were necessary:

> Both Delaware's public schools and the counties depend on the current, albeit broken, system of property tax assessments. It could cause significant disruption to important public services if the administration of that system was suddenly brought to a halt. Any remedial calculus must take into account a range of equities and considerations.

*DEO III*, 239 A.3d at 465. The court also noted that the effects of the COVID-19 pandemic introduced additional and significant considerations for any remedial calculus. *Id.*

## D.    The Settlements

During the remedial phase, the plaintiffs reached settlements with the Counties. Dkts. 418, 427, 441. In those settlements, the Counties agreed to conduct general reassessments. The New Castle County reassessment is scheduled to be completed in 2022. The Kent and Sussex County reassessments are scheduled to be completed in 2023.

---

[2] *See In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 940 & n.59 (Del. Ch. 2003) (citing Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 402–03 (1942)). *See generally* Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 502–03 (2002).

The implementation of the settlements remains on-going. Based on the quarterly reports that the Counties have submitted, they appear to be making good progress. *See, e.g.*, Dkts. 457–59, 465–66, 470.

**E.      The Fee Application**

On May 10, 2021, the plaintiffs moved for a fee award. Dkt. 442. The plaintiffs sought the following awards:

- $1,885,523 from New Castle County;

- $211,638 from Kent County;

- $406,359 against Sussex County.

*Id.* at 13. The aggregate request was $2,503,520.

In justifying the amount, the plaintiffs focused primarily on the benefits conferred by the litigation. The plaintiffs noted that the general reassessments will eliminate longstanding violations of the Uniformity Clause and the True Value Statute. The plaintiffs also explained that the reassessment process should help avoid problems in the future, because each of the Counties is generating a database that will facilitate future reassessments.

The plaintiffs pointed out that an immediate effect of the general reassessments will be that each of the local school districts will have the right to a 10% increase in property tax revenue without resorting to a referendum. The plaintiffs calculated that if each school district accepts the 10% increase, then the annual monetary benefit for the school districts and the children they serve will be:

- $34,447,319 in New Castle County;

- $4,227,880 in Kent County;

- $8,102,667 in Sussex County.

*Id.* The vocational-technical school districts also will benefit to the following degrees:

- $2,969,259 in New Castle County;

- $534,628 in Kent County;

- $888,112 in Sussex County.

*Id.* at 14.

The plaintiffs recognized that the school districts would not begin receiving these amounts until after the Counties completed their reassessments, and so they submitted an affidavit from an expert, Brett Margolin, Ph.D., who calculated the present value of the additional funding that the local school districts could receive during the first five years after the reassessments were complete. Those figures were:

- $183,018,927 for school districts in New Castle County;

- $20,542,723 for school districts in Kent County;

- $39,443,377 for school districts in Sussex County.

*Id.* at 15. The plaintiffs noted that one percent of the total net present value of the benefit was $2,430,050, approximately the amount of the fee award they sought. *Id.* at 16.

As a cross-check, the plaintiffs cited the time and effort that their counsel invested the case. They explained that the County Track involved hard fought litigation that started with extensive briefing on motions to dismiss, proceeded through discovery, and involved

15

a trial on liability issues. After prevailing on liability, the plaintiffs had progressed into the remedial phase and were headed towards a trial when the settlements were reached.

Counsel valued their time and expenses at $2,282,589. *Id.* They submitted an affidavit from Elizabeth M. McGeever, a well-known Chancery practitioner, who addressed the range of reasonable hourly rates for attorneys practicing in the Court of Chancery who have comparable years of experience in performing work of similar complexity.

The plaintiffs also explained why other factors traditionally considered by the court supported the reasonableness of the fee award. Those factors included (1) the relative complexity of the litigation, where the plaintiffs had to overcome the numerous non-merits-related defenses that the Counties had raised, (2) the fact that the plaintiffs and their counsel undertook the matter without any expectation of compensation except through a fee award, and (3) the standing and ability of counsel. *See id.* at 20–23.

In addition to seeking a fee award under general equitable principles, the plaintiffs sought to recover fees under Court of Chancery Rule 37(c), which states:

> If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the Court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The Court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 35(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (4) there was other good reasons for the failure to admit.

16

Ct. Ch. R. 37(c). The plaintiffs explained that they had served requests for admissions that addressed key factual issues in the case. The Counties denied those requests for admission. At trial, the plaintiffs proved the facts that were the subject of the requests for admission. Indeed, the Counties offered no evidence to the contrary. *See* Dkt. 442 at 24–28.

## F. The Bifurcated Proceedings

By stipulation dated May 18, 2021, the parties bifurcated the proceedings on the fee application. Dkt. 445. Under the stipulation, the parties first would address whether the plaintiffs had any entitlement to a fee award. The stipulation provided that

> [i]f the Court determines that the Original Plaintiffs have established an equitable or legal basis for the award of any portion of the attorneys' fees or costs sought by the Motion, the parties will confer regarding a schedule to complete discovery and briefing as to the reasonableness of those fees and costs requested by the Original Plaintiffs that the Court has determined may be awarded.

*Id.* ¶ 4.

That approach made sense to the court. While recognizing that the Counties had not yet weighed in on the issue, the magnitude of the fee award that the plaintiffs had requested seemed facially reasonable under traditional metrics. The court inferred that the parties primarily disagreed about the plaintiffs' entitlement to a fee award. The court anticipated that if the entitlement issue was resolved, then further proceedings on the amount of the fee award might not be necessary or would be limited.

## G. The Entitlement Order

After briefing and argument, the court issued the Entitlement Order, which held that the plaintiffs could recover a fee award from the Counties under general equitable

17

principles. EO ¶ 26. The court explained that in addition to fitting the paradigm for a fee award, public policy supported providing an incentive for the plaintiffs in this particular case:

> As the Opinion described at length, Delaware's system of property tax assessment had become irretrievably broken. It has been decades since the counties conducted their last general assessments, and Delaware policymakers have long recognized that the counties' failure to update their assessments undermined Delaware's system for funding public schools. Yet in the intervening decades, no one stepped forward to fix the system. The counties had not taken action, and the political branches had not stepped in. Absent a legal challenge, Delaware's inequitable system of property tax assessment would have persisted.
>
> Nor was it reasonably likely that anyone except groups like the plaintiffs would be able to mount a meaningful challenge. . . . If there ever was a setting that called for incentive to litigate, this was it.

*Id.* ¶¶ 13–14 Because the Entitlement Order found that the plaintiffs could recover a fee award under equitable principles, the court did not reach the plaintiffs' argument under Rule 37(c). *Id.* ¶ 26.

## H.     The Application

After issuing the Entitlement Order, the court sent the parties a letter suggesting next steps. It stated:

> With the court having addressed the issue of the plaintiffs' entitlement to a fee award, the next issue is to quantify the amount. The parties should confer in an effort to reach agreement on a reasonable award, without prejudice to the counties' position (rejected by the court) that the plaintiffs are not legally entitled to any award. If the parties cannot agree, then the parties should confer regarding what additional briefing is necessary to present the issue for decision.

18

Dkt. 467. The court hoped that the parties would be able to agree on the amount of an award without the need for further proceedings and without waiving any right that the Counties would have to an appeal.

The next day, the Counties filed the Application. Among other things, the Application signals the Counties' intent to litigate vigorously over the amount of the fee award. In support of their argument that an immediate appeal would be efficient, the Counties detailed how far they intend to go in opposing the plaintiffs' request:

> [T]he Counties must review Plaintiffs' counsel's billing statements, take discovery regarding several issues (e.g. the time spent on this case; the hourly rates Plaintiffs aver) and depose Plaintiffs' experts. Additionally, the Court invited the parties to take discovery regarding the issue of whether any school or vocational district will, in fact, raise taxes . . . .

Appl. ¶ 29. It seems reasonable to infer that if the Counties plan to expend that level of resources to oppose the quantification of the fee award, then they also will expend the resources necessary to pursue an appeal from an order quantifying the award.

## II.    LEGAL ANALYSIS

Supreme Court Rule 42 governs the certification of an interlocutory appeal. "[T]he purpose of Rule 42 is to prevent wasteful piecemeal litigation from overwhelming the docket of the Supreme Court." *Stein v. Blankfein*, 2019 WL 3311227, at *1 (Del. Ch. July 23, 2019).

Rule 42 states that "[n]o interlocutory appeal will be certified by the trial court or accepted by this Court unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment." Supr. Ct. R. 42(b)(i). If the "substantial issue" requirement is met, then the trial court will analyze

19

whether "there are substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal." Supr. Ct. R. 42(b)(ii). The rule identifies eight factors relevant to the assessment. Supr. Ct. R. 42(b)(iii)(A)–(H).

## A. The Substantial Issue Requirement

"The 'substantial issue' requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters." *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008); *accord Castaldo v. Pittsburgh–Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973). The substantial issue requirement is not met in this case.

The Counties have not identified any authority suggesting that a ruling about whether a party could obtain a fee award decides a substantial issue sufficient to warrant an interlocutory appeal. A fee award is not part of a merits determination. It is collateral to the merits determination. A decision holding that a ruling on whether a party could obtain a fee award constituted a substantial issue would create a potentially fertile source of applications under Rule 42. Parties become entitled to fee awards at various points during litigation, including during discovery as a result of motions to compel. That type of appellate on-ramp would run contrary to both the letter and spirit of Rule 42.

The Entitlement Order decided the collateral issue of the plaintiffs' entitlement to a fee award. It did not address the merits of the case. It addressed one of the two principal issues involved in determining whether a party can recover a fee award, the second being the quantification of the award.

20

The Counties therefore have not established the predicate for an interlocutory appeal. That does not mean that the Counties do not have a basis for appeal. The Counties have advanced a narrow interpretation of *Korn v. New Castle County*, 992 A.2d 409 (Del. 2007), under which that decision only authorizes fee awards in suits brought by taxpayers that benefit taxpayers and rejects all other fee awards against government entities. The Entitlement Order agreed that *Korn* involved a suit brought by a taxpayer that benefited taxpayers, but the Entitlement Order rejected the argument that *Korn* limited fee awards to that setting. *See* EO ¶ 11. Whether *Korn* forecloses a fee award in this case, as the Counties maintain, is something that the Delaware Supreme Court should decide.

The real question is when. Because the Entitlement Order does not decide a substantial issue, there is no reason for the appeal to happen now. Instead, this case should follow the normal process for an appeal.

The normal process will result in the Counties being able to appeal in the near future. The settlements have resolved the merits issues. The court has retained jurisdiction to oversee the implementation of the settlements, but there are currently no disputes over that aspect of the case. The only contested matter is the fee award. In the ordinary course of events, an appeal would happen after proceedings on the fee award were complete.

The Court of Chancery Rules provide a mechanism for the Counties to take an appeal following the completion of proceedings on the fee award. Rule 54(b) provides

> When more than 1 claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, the Court may direct the entry of a final judgment upon 1 or more but fewer than all of the claims or parties only upon an express determination that there is not just reason for delay and upon an express direction for the entry of judgment.

21

Ct. Ch. R. 54(b). "Thus, to grant [the defendant's] motion, the [c]ourt must find that (1) the action involves multiple claims or parties, (2) at least one claim or the rights and liabilities of at least one party has been finally decided, and (3) . . . there is no just reason for delaying an appeal." *Sider v. Hertz Glob. Hldgs., Inc.*, 2019 WL 2501481 (Del. Ch. June 17, 2019) (cleaned up).

Rule 54(b) provides the appropriate mechanism for facilitating an appeal in this case. Rule 54(b) does not require that the ruling in question have decided a substantial issue. The court instead considers whether a claim in the case has been decided finally at the trial level and whether there is any just reason for delaying an appeal.

Here, the plaintiffs advanced a claim to a fee award. After the court has quantified the fee award, then that claim will have been decided. There will be no just reason for delay, and the court can certify the appeal under Rule 54(b).

It is understandable that the Counties want to pursue their appeal, but they lack grounds for pursuing it now. They will be able to pursue it soon, consistent with the ordinary progression of a case. What the Counties cannot identify is a substantial issue warranting certification under Rule 42.

## B.     The Multi-Factor Balancing

A ruling addressing a substantial issue is a necessary but not sufficient condition for the certification of an interlocutory appeal. The trial court's ruling also must "merit[] appellate review before a final judgment." Supr. Ct. R. 42(b)(i). The Delaware Supreme Court has counseled that "[i]nterlocutory appeals should be exceptional, not routine,

22

because they disrupt the normal procession of litigation, cause delay, and can threaten to exhaust scarce party and judicial resources." Supr. Ct. R. 42(b)(ii).

When analyzing whether an issue warrants the certification of an interlocutory appeal, Rule 42(b)(iii) instructs trial courts to consider eight factors. Here, the factors do not favor certification.

### 1. An Issue Of First Impression

The first factor asks whether "[t]he interlocutory order involves a question of law resolved for the first time in this State." Supr. Ct. R. 42(b)(iii)(A). The Counties attempt to satisfy this factor by portraying the Entitlement Order as creating "an unprecedented new exception to the American Rule in public interest litigation." Appl. ¶ 1.

The Entitlement Order did not create a new exception. The court applied the Delaware Supreme Court's decision in *Korn* in conjunction with long-standing equitable principles governing fee awards. The Entitlement Order found that under the facts of the case, equitable principles warranted a fee award. The Entitlement Order did not announce a new rule of law or create a new doctrine.

The Counties may try to portray the Entitlement Order as novel, but it is ultimately just a ruling addressing a fee award. The first factor does not favor certification.

### 2. Conflicting Trial Court Decisions

The second factor asks whether "[t]he decisions of the trial courts are conflicting upon the question of law." Supr. Ct. R. 42(b)(iii)(B). The purpose of this factor is to identify a situation where the Delaware Supreme Court may need to step in to resolve a dispute and

23

clarify the law. The Entitlement Order does not conflict with any other decisions of the trial courts.

In support of this factor, the Counties contend that the Entitlement Order concluded improperly that a fee award can be paid by a "suitable intermediary." Appl. ¶ 28. They cite a case in which this court denied a hostile bidder's attempt to recover a fee award from a target company after it had been acquired by a competing bidder. *See id.* (citing *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216, 1233 (Del. Ch. 2001), *aff'd*, 818 A.2d 959 (Del. 2003)). The Entitlement Order cited *Mentor Graphics* for certain legal principles, *see* EO ¶ 12, but the facts in *Mentor Graphics* and this case are sufficiently different that one cannot reasonably say that the outcome in *Mentor Graphics* is inconsistent with the Entitlement Order.

The Counties also contend that the authorities on which the plaintiffs relied are "distinguishable because the non-beneficiary either agreed to pay the fees or conceded that it had benefitted from the litigation." Appl. ¶ 28. Saying that cases are distinguishable is different than saying that the decisions conflict with the Entitlement Order. By saying that the cases are distinguishable, the Counties are arguing that the decisions did not provide sufficient support for the Entitlement Order, not that they conflicted with the Entitlement Order.

As this decision has recognized, the Counties have raised a question about the proper interpretation of *Korn* that is fairly litigable. That is different than showing that decisions of the trial courts conflict. They do not, and this factor does not warrant certification.

### 3. A Challenge To A Statute

The third factor asks whether "[t]he question of law relates to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by this Court in advance of an appeal from a final order." Supr. Ct. R. 42(b)(iii)(C). The Counties do not seek to invoke this factor, conceding that it does not favor certification.

### 4. Controverted Jurisdiction

The fourth factor asks the court to determine whether "[t]he interlocutory order has sustained the controverted jurisdiction of the trial court." Supr. Ct. R. 42(b)(iii)(D). The Counties do not seek to invoke this factor, conceding that it does not favor certification.

### 5. An Appellate Ruling

The fifth factor asks whether the interlocutory order "reversed or set aside a prior decision of the trial court, a jury, or an administrative agency from which an appeal was taken to the trial court." Supr. Ct. R. 42(b)(iii)(E). The Counties do not seek to invoke this factor, conceding that it does not favor certification.

### 6. Vacating Or Opening A Judgment

The sixth factor asks whether the interlocutory order has "vacated or opened a judgment of the trial court." Supr. Ct. R. 42(b)(iii)(F). The Counties do not seek to invoke this factor, conceding that it does not favor certification.

### 7. The Possible Termination Of The Litigation

The seventh factor asks whether "[r]eview of the interlocutory order may terminate the litigation." Supr. Ct. R. 42(b)(iii)(G). The Counties do not seek to invoke this factor, conceding that it does not favor certification.

25

### 8. The Considerations Of Justice

The eighth factor asks whether "[r]eview of the interlocutory order may serve considerations of justice." Supr. Ct. R. 42(b)(iii)(H). The Counties argue that review of the Entitlement Order may serve considerations of justice because it may enable the Counties to avoid expending the resources necessary to quantify the fee award. The Counties assert that "[t]hose costs will be significant," because the Counties intend to review billing records from plaintiffs' counsel, and take discovery "regarding several issues" including the time spent on the case and the hourly rates that plaintiffs claim. Appl. ¶ 29. The Counties also intend to depose the plaintiffs' experts. *Id.* The Counties even say that they plan to take discovery into whether any school or vocational district will, in fact, raise taxes, claiming that the trial court invited them to do that. *Id.*

The Counties misread the Entitlement Order to the extent they believe that the court invited discovery into whether any school or vocational district will, in fact, raise taxes. As support, the Counties cite the following paragraph:

> The counties respond that the potential to claim a 10% increase in tax revenue is too speculative to support an award of attorneys' fees and expenses. Opp'n at 3–6, 17–20. According to the counties, the benefit cannot be quantified because the counties have not yet conducted general assessments, and the school districts may ultimately choose not to exercise their right to increase taxes. Those arguments are not persuasive. Increased optionality is a benefit, so the ability to claim the increased tax revenue standing alone is a positive. Moreover, "it is highly likely that school districts will happily accept the 10% increase in revenue that would result from a general reassessment," *DEO III*, 239 A.3d at 532. Not doing so would be irrational. Regardless, the extent of the benefit can be quantified further during the second phase of briefing on the plaintiffs' motion.

EO ¶ 20. The court did not anticipate wide-ranging third-party discovery involving school

26

boards or school districts. The court envisioned some additional math and perhaps some expert analysis.[3]

Even without wide-ranging third-party discovery, the Counties' litigation plans are surprising. The court regularly decides fee applications based only on the parties' papers and an affidavit from counsel pursuant to Court of Chancery Rule 88. Typically, discovery is limited to the production of invoices from both the party seeking the award and the party resisting the award. The former enables the party resisting the award to examine the reasonableness of what the plaintiff has done, and the latter provides a cross-check by showing what a similarly situated party invested in the same litigation.

Rarely are depositions of counsel warranted. It is equally rare for a fee application to involve expert affidavits. Here, the expert affidavits were narrowly tailored. Margolin performed some mathematical calculations. McGeever validated general understandings

---

[3] As the Entitlement Order observed, it is not clear why it matters to the quantification of the fee award that some beneficiaries of a settlement may opt not to take advantage of it. That possibility is not novel, nor is it unique to this context. For example, scholars have found that institutional investors historically have not sought their share of recoveries in securities actions. *See generally* Randall S. Thomas & Harwell Wells, *James D. Cox: The Shareholders' Best Advocate*, 66 Duke L.J. 467, 494–95 (2016); David H. Webber, *Is "Pay-to-Play" Driving Public Pension Fund Activism in Securities Class Actions? An Empirical Study*, 90 B.U. L. Rev. 2031, 2040–41 (2010); John C. Coffee, Jr., *Litigation Governance: Taking Accountability Seriously*, 110 Colum. L. Rev. 288, 310 (2010). That fact has not changed how courts evaluate fee awards, where the analysis generally does not involve consideration of take-up rates. The litigation provides the opportunity to receive the money; plaintiffs' counsel cannot force people to take it. Courts are generally content to assume that people will accept the money that the settlement offers.

about market rates. Their depositions do not seem necessary, but if the Counties wish to pursue them, the depositions should be relatively straightforward.

There is considerable irony in the Counties' argument about avoiding the burdens of litigation. It bears reiterating that the Counties advanced no defense on the merits. They could not muster any factual or legal basis to contend that the Indefinite Base Year Method did not violate the True Value Statute or the Uniformity Clause. They argued vigorously that the plaintiffs lacked standing to sue and hence were not the right parties to establish that the Counties were violating the True Value Statute or the Uniformity Clause. And they made evidentiary objections to the otherwise uncontested analysis conducted by the plaintiffs' expert. But at bottom, the Counties had no merits-related defense. The Counties thus could have avoided this entire proceeding by acknowledging that the Indefinite Base Year Method was problematic and taking action to comply with the law. By doing so, they would have avoided the risk of a meaningful fee award.

Although opting voluntarily to make the property tax regime legally compliant would have avoided the burdens of this litigation and minimized the risk of a fee award, it would have been politically difficult. Elected county officials would have needed to touch a political third rail by making a decision that would lead to property tax increases for some county residents. A court ruling on liability would provide political cover. The Counties signaled that reality early in the case, after the court invited settlement discussions, when they informed the court that "[n]one of the County Defendants are presently in a position to resolve the lawsuit consensually. If, after discovery and dispositive motions or trial on liability issues, this Court finds in favor of the Plaintiffs, the likelihood of the County

Defendants agreeing to a consensual resolution would significantly increase." Dkt. 96 at 4. After the court issued its post-trial decision, one county official explained the settlement as something beyond the elected officials' control: "Unfortunately, the court did not rule in our favor, and while we may disagree with the outcome that now ties our collective hands, the reality is our options moving forward were limited." Chandler Parr, *Sussex County to Reassess Properties for the First Time Since 1974*, WRDE Coast TV (April 14, 2021), https://www.wrde.com/story/43670922/sussex-county-to-reassess-properties-forthe-first-time-since-1974 (last visited April 24, 2022) (quoting Sussex County President Michael H. Vincent).

It is quite incongruous for the Counties to have insisted on a trial on liability, only to protest now about the burden of quantifying a fee award. Having swallowed the camel, they strain at the gnat.

Choosing to resist a case has consequences. One consequence is that it increases both the likelihood and the size of a potential fee award. The likelihood increases because it becomes plain that the litigation caused the result. The size increases because the plaintiffs have to put in the work necessary to achieve the result. Having made their choice, the Counties are not well-positioned to complain.

Discovery related to the fee award should not be burdensome. Avoiding what should be a relatively straightforward quantification of the fee award does not provide sufficient grounds to certify an interlocutory appeal.

### 9. The Balancing

None of the eight factors favors interlocutory review. At best, the eighth factor might be viewed as supporting interlocutory review weakly.

With the factors assessed, Rule 42 directs the trial court to engage in the following inquiry:

> After considering these factors and its own assessment of the most efficient and just schedule to resolve the case, the trial court should identify whether and why the likely benefits of interlocutory review outweigh the probable costs, such that interlocutory review is in the interests of justice. If the balance is uncertain, the trial court should refuse to certify the interlocutory appeal.

Supr. Ct. R. 42(b)(iii). There must be "substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal." *Id.*

From the trial court's perspective, the interests of justice do not support interlocutory review at this stage. An interlocutory appeal will not generate benefits, much less substantial benefits sufficient to outweigh the certain costs.

Contrary to the Counties' argument, an interlocutory appeal at this point will not avoid the prospect of future appeals. If the Delaware Supreme Court affirms the Entitlement Order, then the high court would need to remand the case for this court to quantify the result. The Counties' avowed intention to litigate vigorously over the reasonableness of the fee award provides a strong indication that they would likely appeal any non-trivial amount. The Delaware Supreme Court thus would face a second appeal.

The Counties are correct that if the Delaware Supreme Court reversed the Entitlement Order, then the parties and the trial court would not have to quantify an

30

equitable fee award, but that would not be the end of the matter. If an equitable award is unavailable, then the plaintiffs' request for an award under Rule 37(c) becomes salient. This court did not reach that issue because it decided the fee petition on equitable grounds. The high court likely would remand the case so that the trial court could address the Rule 37(c) issue in the first instance. The Counties then could appeal that result, generating another appeal.

Admittedly, the same potential need to address a fee award under Rule 37(c) exists in the event of a reversal after a quantified fee award. At best for the Counties, the possibility of an eventual need to address a fee award under Rule 37(c) makes the balancing uncertain. Rule 42 directs the trial court to deny certification when the balancing is uncertain.

The better course is for the trial court to quantify the fee award. At that point, the claim to a fee award will be resolved, making it appropriate to enter a partial final judgment under Rule 54(b). The Delaware Supreme Court then can entertain a single appeal addressing the award as a whole.

## III.  CONCLUSION

This court's role under Rule 42 is to make a recommendation. In this case, that recommendation is to decline to accept the interlocutory appeal. The Application is therefore DENIED.

31